IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| JOHN F. KENNEDY, solely in his capacity as Receiver for the Receivership Estate of Education Corporation of America, Virginia College, LLC, & New England College of Business and Finance, LLC, and MONROE CAPITAL MANAGEMENT ADVISORS, LLC,<br><br>v.                    Plaintiffs,<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.<br><br>                              Defendant. | Civil Action No. ----<br><br>Related Civil Action No. 5:18-cv-00388-TES<br><br><br>**Complaint** |

Plaintiffs John F. Kennedy (the "Receiver"), solely in his capacity as Receiver for the Receivership Estate of Education Corporation of America, Virginia College, LLC, and New England College of Business and Finance, LLC (collectively, "ECA"), and Monroe Capital Management Advisors, LLC ("Monroe") bring this complaint against ECA's insurance company, National Union Fire Insurance Company of Pittsburgh, PA ("Defendant" or "National Union") for breach of contract for failing to pay Plaintiffs for losses ECA suffered, bad faith denial of claims, and declaratory action holding that the insurance policy in question covers the claims for losses both known and unknown.

**INTRODUCTION**

1. ECA's business was to own and operate for-profit colleges and other training institutions across the nation. In December of 2018, ECA was forced to abruptly close its schools and shutter its seventy-one campuses. At the time of these closures, many of ECA's campuses housed expensive equipment, furniture, and supplies. At twenty-one of ECA's campuses,

extensive theft occurred of ECA property prior to or soon after the closures resulting in losses of over $5.73 million.

2. Pursuant to the Court's Supplement Order (Doc. 104, the "Supplemental Order"), dated December 13, 2018, Monroe Capital Management Advisors, LLC ("Monroe") was "permitted to take possession of, sell, or otherwise liquidate the Remaining Personalty [as defined in the Supplemental Order] without being in violation of the injunction of the Receiver Order [Doc. 26] or this Order [. . . .]" (Doc. 104, p. 3).

3. The Supplemental Order further authorized the Receiver to "take all actions, as he deems reasonable and necessary in his sole discretion, to comply with and/or take action in furtherance of the purposes of this Order and the Receivership Order." (Doc. 104, p. 3).

4. The items at dispute for coverage under the policies constitute Remaining Personalty as defined in the Supplemental Order.

5. ECA had commercial crime insurance through its insurance policy with National Union that covered employee theft and robbery on its campuses. Monroe Capital Management Advisors, LLC ("Monroe"), ECA's presumed senior secured lender and collateral agent, timely filed twenty-one claims with National Union under the crime coverage section of the insurance policy. Subsequently, the Receiver appointed by the Court adopted the proofs of loss submitted by Monroe.

6. National Union denied coverage of ECA's claims across the board. It refused to pay a cent for ECA's losses, even in instances where witnesses caught ECA employees in the act of stealing ECA equipment—but were unable to prevent the theft—and coverage was undeniable. National Union's blanket denial of ECA's claims breached the insurance policy and its coverage denials were made in bad faith. As the Receiver continues to investigate these losses, declaratory

judgment that the policy covers ECA's losses is also needed for any currently unknown losses.

**PARTIES**

7.      Plaintiff, John F. Kennedy is the Receiver for ECA. Mr. Kennedy was appointed Receiver by the Court (the "Receivership Court") on November 14, 2018 (the "Appointment Date").[1] Mr. Kennedy is a Georgia citizen.

8.      Plaintiff, Monroe Capital Management Advisors, LLC ("Monroe") is a Delaware limited liability company headquartered in Chicago, Illinois.

9.      Defendant, National Union Fire Insurance Company of Pittsburgh, PA. is a domestic stock property insurance company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in New York, New York.

**JURISDICTION AND VENUE**

10.     This Court has personal jurisdiction over the Defendant because the Defendant contracted to insure ECA's property within this Court's jurisdiction and this lawsuit includes claims related to that insured property. Additionally, Defendant is authorized to do business in Georgia, and its transaction of business here through contracts to provide insurance services for property located here give rise to some of the Plaintiffs' claims against it.

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a). Federal district courts have original jurisdiction where the matter in controversy exceeds $75,000 and is between "citizens of different States."[2]

12.     Plaintiff Receiver is a Georgia citizen. "[T]he general common law rule [is] that courts will look to the citizenship of a trustee, *receiver,* administrator, or other representative, and

---

[1] See Order Appointing Receiver and Preliminary Injunction, *VC Macon, LLC GA v. Virginia College, LLC, et al.*, Case No. 5:18-cv-00388 (M.D. Ga. Nov. 14, 2018) (Doc. 26) (the "Appointment Order").
[2] 28 U.S.C. § 1332(a)(l).

not the party which he represents, in determining diversity jurisdiction."[3] Accordingly, only the Receiver's Georgia citizenship, and not the citizenship of ECA or any of its subsidiaries, is relevant for purposes of determining diversity jurisdiction.

13. Plaintiff Monroe is a limited liability company and it is thus a citizen of the states in which its members reside, none of which reside in Georgia.

14. The Defendant, on the other hand, is a citizen of the Commonwealth of Pennsylvania and the State of New York.

15. This action alleges more than $5.73 million in damages and therefore satisfies the $75,000 minimum jurisdictional threshold. Accordingly, this Court has jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a)(l).

16. In addition, or in the alternative, this Court has ancillary jurisdiction over this action based on the Appointment Order entered by the Receivership Court and under 28 U.S.C. §§ 754 and 1692.

17. "When a receiver brings a recovery action in furtherance of his duties, therefore, the appointing court has ancillary subject matter jurisdiction over every such suit irrespective of diversity, amount in controversy or any other factor which would normally determine jurisdiction."[4]

---

[3] *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624,628 (2d Cir. 1976) (*emphasis added*); *see also Gross v. Hougland,* 712 F.2d 1034, 1040 (6th Cir. 1983) (looking at receiver's citizenship for purposes of determining whether diversity existed instead of citizenship of entities over which receiver was appointed); *Hong Kong Deposit & Guar. Co. v. Hibdon,* 602 F. Supp. 1378, 1380 (S.D.N.Y. 1985) (same).

[4] *Janvey v. Reeves-Stanford,* No. 3:09-CV-2151-N, 2010 WL 11463486, at *4 (N.D. Tex. Nov. 18, 2010); *see also Crawford v. Silette,* 608 F.3d 275,278 (5th Cir. 2010) ("[I]t has long been an undisputed proposition that the initial suit which results in the appointment of the receiver is the primary action and that any suit which the receiver thereafter brings in the appointment court in order to execute such duties is ancillary to the main suit."); *Robb Evans & Assocs., LLC v. Holibaugh,* 609 F.3d 359,362 (4th Cir. 2010) ("The appointment of a receiver of a debtor's property

18. The Receiver was appointed by the Receivership Court to manage and control the property of the Receivership Estate, and the Appointment Order specifically vests the Receiver with the authority to assert actions such as this one.[5] The Appointment Order also gives the Receiver the right to pursue, for the benefit of the Receivership Estate, claims that could be asserted by ECA's creditors.[6]

19. In relevant part, the Appointment Order states that the Receiver has the authority "[t]o assert any rights, claims, or choses in action of ECA [...] that are Receivership Property or related thereto, to maintain in the Receiver's name or in the name of ECA any action to enforce any right, claim, or chose in action, and to intervene in actions in which ECA is a party for the purpose of exercising the powers under this Order."[7]

20. The Appointment Order further states that "all the business, business interests and property of [ECA, Virginia College and NECB], wherever located, by whomsoever held, without limitation... shall hereby be vested in a Receivership Estate."[8]

21. Here, the Receiver brings this action on behalf of the Receivership Estate against National Union based on damages its breach of contract and bad faith denial of claims caused the Receivership Estate, and to determine the Receivership Estates right to coverage. His claims against the Defendant are an asset of the Receivership Estate.

22. "A receiver has standing to bring ancillary recovery actions in the appointing court

---

by a federal court confers upon it, regardless of citizenship and of the amount in controversy, federal jurisdiction to decide all questions incident to the preservation, collection, and distribution of the assets. It may do this either in the original suit ... or by ancillary proceedings.") (*quoting Riehle v. Margolies,* 279 U.S. 218, 223 (1929)).

[5] (Doc. 26, pp. 4-5).
[6] (Doc. 26, p. 6).
[7] (Doc. 26, p. 5).
[8] (Doc. 26, p. 4).

5

regardless of the jurisdiction in which property traceable to the entities in receivership may be found. This power flows from the plain language of 28 U.S.C. § 754."[9]

23.     28 U.S.C. § 754 states that:

A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

He shall have capacity to sue in any district without ancillary appointment and may be sued with respect thereto as provided in section 959 of this title.

Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

24.     In addition, 28 U.S.C. § 1629 states:

In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district, but orders affecting the property shall be entered of record in each of such districts.

25.     As required by these statutes, the Receiver filed notice of the Appointment Order (and the underlying complaint) with all federal districts within the United States "within ten days after the entry of his order of appointment."[10]

26.     Accordingly, the Receiver was "vested with complete jurisdiction and control over" claims of the Receivership Estate, and this Court has jurisdiction to hear this matter.

27.     Moreover, the Court has supplemental jurisdiction over all claims in which the district court does not have original jurisdiction pursuant to 28. U.S.C. §1367 as the claims are so

---

[9] *Reeves-Stanford,* 2010 WL 11463486, at *3.

[10] 28 U.S.C. § 754; *see example* Notice of Filing, *VC Macon, GA, LLC v. Virginia College, LLC et al.,* Case No. 18-mc-00750 (N.D. Ill. filed Nov. 16, 2018) (Doc. 1). On November 27, 2018, the Receiver filed his Notice of Compliance with the Receivership Court submitting that the Receiver had filed notices in every federal district court in the United States of America pursuant to 28 U.S.C. § 754. *(See* Doc. 35).

related "that they form part of the same case or controversy."

28.     Finally, venue is proper in this Court because property of the Receivership Estate - including claims of the Receivership Estate - are under the control of the Receivership Court.[11]

## FACTUAL BACKGROUND

29.     ECA's business was to own and operate for-profit colleges and other training institutions across the nation. At the time ECA closed in 2018, it had approximately 20,000 students and 71 campuses across the country.

### *The National Union Insurance Policy*

30.     National Union is ECA's insurer. National Union issued ECA insurance policy 01-772-17-09 (the "Policy"), which covered—among other things—ECA's tangible property in all of the premises where it conducted business. (Policy attached as **Ex. A**). The Policy Period began September 3, 2018 and ended September 3, 2019. (*Id*).

31.     The Policy includes Commercial Crime Insurance for ECA in the "Crime Coverage Section." (Ex. A, pp26-50). In Insuring Agreement 1.A. of the Crime Coverage Section, the Policy covers ECA for losses due to Employee Theft as follows:

> The Insurer will pay for loss of or damage to **Money**, **Securities** and **Other Property** resulting directly from **Theft** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons. (Ex. A, p26).

32.     The Policy defines "Theft" as follows:

> "**Theft**" means the unlawful taking of **Money**, **Securities** or **Other Property** to the deprivation of the **Insured**. Solely with respect to Insuring Agreement 1.A., Theft shall also mean forgery. (Ex. A, p31).

---

[11] *See Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) ("The laying of venue ... is authorized by 28 U.S.C. § 754, which allows a receiver to sue in the district in which he was appointed to enforce claims anywhere in the country."); *S.E.C. v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004) (same); *Haile v. Henderson Nat. Bank*, 657 F.2d 816, 822 (6th Cir. 1981) (in receivership action "where jurisdiction is ancillary, the post-jurisdictional consideration of venue is ancillary as well.").

33.     The Policy defines "Other Property" as follows:

"**Other Property**" means any tangible property other than **Money** and **Securities** that has intrinsic value. **Other Property** does not include intangible property, including, but not limited to, computer programs, electronic data or any other property excluded under this **Crime Coverage Section**. (Ex. A, p30).

34.     In Insuring Agreement 1.D. of the Crime Coverage Section, the Policy covers ECA for losses due to Robbery of Other Property Inside the Premises as follows:

(i) The **Insurer** will pay for loss of or damage to **Other Property**: (1) inside the **Premises** resulting directly from an actual or attempted **Robbery** of a **Custodian**; . . . (Ex. A, p27).

35.     The Policy defines "Robbery" as follows:

"**Robbery**" means the unlawful taking of property from the care and custody of a person by one who has: (i) caused or threatened to cause that person bodily harm; or (ii) committed an obviously unlawful act witnessed by that person.

### *ECA Receivership and School Closures*

36.     On November 14, 2018, the Receivership Court appointed John F. Kennedy as the Receiver of "all the business, business interest[,] and property of [ECA], wherever located, by whomsoever held, without limitation" to be "vested in a Receivership Estate." (Appointment Order, Doc. 26, pp 4, 15).

37.     ECA initially planned to restructure by closing 26 of its less profitable campuses over the course of two years. However, on December 5, 2018, ECA's precarious financial status required ECA to announce that it would immediately cease operations and wind down.

38.     Many of the ECA campuses had their last school day only two days later, on December 7, 2018, with skeleton crews present for another week to shutter the locations. At the time of these closures, the campuses housed expensive equipment, machinery, furniture, and supplies.

39.     The unforeseen and abrupt closures of ECA's 71 campuses prevented the orderly liquidation of the tangible assets present at those locations in advance of the date the locations

were shuttered. It also resulted in the loss or inaccessibility of certain financial records.

40.     ECA management directed their employees to secure the locations between the last day of school and the closure dates to protect the assets. However, the implementation of security measures was uneven, and many ECA employees colluded in the theft of valuable ECA equipment.

### *ECA Employee Theft and Robbery*

41.     At the Virginia College in Birmingham, Culinary School, on the final day of school, December 18, 2018, two ECA employees, Dennis Sanders and Brandon Fee, witnessed a third ECA employee, Jared Danks, removing culinary equipment from the premises into a truck. Mr. Sanders confronted Mr. Danks who responded that everyone else was taking equipment, so why was it a problem that he did it. When Mr. Sanders pressed Mr. Danks on who gave him authority to remove the equipment, Mr. Danks ignored him and continued with the theft. Over the next few days, ECA employees attempted to convince Mr. Danks to return the equipment. When Mr. Danks ultimately refused, Mr. Sanders and ECA employee John Carreon filed a police report detailing the equipment Mr. Sanders observed Mr. Danks stealing. The theft resulted in a loss of $393,363 in ECA equipment. The criminal prosecution of Mr. Danks continues, but no victim recovery is expected.

42.     At the Brightwood College – Charlotte – the landlord observed people removing property and furniture—including computers, audio-visual equipment, and simulators—from the campus beginning December 5, 2018 and for a few days thereafter. The police were called and investigated. They learned ECA employee and campus president had colluded with the unidentified thieves to accomplish the thefts. The employee admitted to police she had told her unidentified co-conspirators it was okay to remove whatever they wanted. The employee did not have authority to authorize the removal of ECA equipment and she was acting against explicit

management instructions to preserve the assets. The employee falsely told the police no police report was required. The thefts at Charlotte resulted in a loss of $485,006 in ECA equipment.

43. At many other locations, such as the Virginia College – Birmingham, Cosmetology School, the ECA employees charged with closing the locations did so haphazardly without the proper use of security as instructed by ECA management. The improper closure allowed unidentified employees to remove ECA equipment at will. At the Birmingham Cosmetology School, this resulted in a loss of $241,983 in ECA equipment.

44. ECA experienced similar instances of employee theft at its other locations.

45. The losses were caused by clear instances of Employee Theft and Robbery under the Crime Coverage Section of the Policy.

### *Monroe's Security Interests and Rights*

46. Monroe is a purported secured creditor of ECA, with presumed perfected first priority liens and security interests on substantially all of ECA's assets.[12] Pursuant to that certain security agreement, dated as of September 2, 2015 (as subsequently modified, reaffirmed, and amended from time to time, the "Monroe Security Agreement"), Monroe is also ECA's "Collateral Agent".

47. On December 13, 2018, the Receivership Court entered a Supplemental Order deeming the Receiver to have rejected, repudiated, and/or disavowed the lease or other occupancy agreement as to ECA's 71 locations as of Rejection Dates ranging from December 13, 2018 to December 22, 2018. (Doc. 104). The Supplemental Order provided that "Monroe, together with any agents or professionals engaged by Monroe, shall be permitted to take possession of, sell, or

---

[12] The Receivership Court affirmed the priority, perfection, enforceability and validity of Monroe's liens and security interests in ECA's property in its December 13, 2018 Order (a) Authorizing the Receiver to Obtain Ninth Amendment Term Loans and (b) Granting Security Interests and Liens. (Doc. 105, p8)

otherwise liquidate the Remaining Personalty without being in violation of the injunction of the Receiver Order or this Order, following the Rejection Date." (*Id*., p3). The order defined "Remaining Personalty" as any personalty remaining in, or about the demised premises. (*Id*.)

48.     The subject assets that are part of Plaintiffs' loss complained of herein are part of the Remaining Personalty.

49.     Monroe timely followed up on securing the Remaining Personalty, but ECA's landlords at multiple locations resisted Monroe's attempts to access the properties.

50.     By the time Monroe's agents gained access to the properties in January of 2019, the following sites (each an "Affected Location" and collectively the "Affected Locations") had been looted and stripped of assets by ECA employees, persons working in concert with ECA employees, or persons who committing robbery of an ECA Custodian: (i) Virginia College – Birmingham, Culinary School, 488 Palisades, Birmingham, AL; (ii) Virginia College – Birmingham, Call Center, 400 Chase Park South, Birmingham, AL; (iii) Virginia College – Birmingham, Cosmetology, 500 Palisades Bld., Birmingham, AL; (iv) Virginia College – Mobile, 3725 Airport Boulevard & Montlimar Drive, Mobile, AL; (v) Virginia College – Montgomery, 6200 Atlanta Highway, Montgomery, AL; (vi) Virginia College – Columbus, 5601 Veterans Parkway, Columbus, GA; (vii) Virginia College  – Augusta, 2807 Wylds Road, Augusta, GA; (viii) Virginia College – Greensboro, 3700 South Holden Road, Greensboro, NC; (ix) Golf Academy of America – San Diego, 1950 Camino Vida Roble, Carlsbad, CA; (x) Golf Academy of America – Phoenix, 2031 N. Arizona Avenue, Chandler, AZ; (xi) Golf Academy of America – Orlando, 510 South Hunt Club Blvd., Apopka, FL; (xii) Brightwood College – San Diego, 5172 Kiernan Court / 5524 Pirrone Road, San Diego, CA; (xiii) Brightwood College – Riverside, 4040 Vine Street, Riverside, CA; (xiv) Brightwood Career Institute, 3010 Market Street, Philadelphia,

PA; (xv) Brightwood College – Fort Worth, 2001 Beach Street, Fort Worth, TX; (xvi) Brightwood College – Dayton, 2800 East River Rd., Dayton, OH; (xvii) Brightwood College – Charlotte, 6070 East Independence Blvd., Charlotte, NC; (xviii) Brightwood Career Institute – Broomall, 1991 Sproul Road, Broomall, PA; (xix) Kaplan College, 1914 Wible Road, Bakersfield, CA; (xx) Brightwood College – Beltsville, 4600 Powder Mill Road, Beltsville, MD; and (xxi) Brightwood Career Institute – Franklin Mills, 177 Franklin Mills Blvd., Philadelphia, PA.

51. In furtherance of, and in compliance with the Court's Supplemental Order, Monroe and the Receiver jointly file this action for the benefit of the Receivership Estate.

*Claims Made on National Union*

52. On February 5, 2019, ECA's insurance broker submitted notice of claims to National Union under the Policy, Crime Coverage Section, for the Affected Locations.

53. National Union agreed in writing to toll the time for ECA or its agents to follow up the notice of claims with proofs of loss.

54. On January 30, 2020, Vitro Mitria, as Agent for Monroe, submitted the following claims (each a "Claim" and collectively the "Claims") under the Crime Coverage Section of the Policy:

| Affected Location | Claim No. | Loss Amount |
|---|---|---|
| Virginia College – Birmingham, Culinary School | 6247290698US | $393,363 |
| Virginia College – Birmingham, Call Center | 6247290698US[13] | $50,000 |
| Virginia College – Birmingham, Cosmetology School | 5326123930US | $241,983 |
| Virginia College – Mobile | 1090050307US | $50,000 |
| Virginia College – Montgomery | 6237541291US | $100,679 |

---

[13] The Virginia College – Birmingham Culinary School and Call Center were given the same Claim Number, but include separate losses.

| Virginia College – Columbus | 4287683604US | $85,206 |
| --- | --- | --- |
| Virginia College – Augusta | 7676891435US | $301,456 |
| Virginia College – Greensboro | 7957960546US | $402,077 |
| Golf Academy of America – San Diego | 7104994506US | $505,690 |
| Golf Academy of America – Phoenix | 7980950309US | $636,904 |
| Golf Academy of America – Orlando | 0027918255US | $513,658 |
| Brightwood College – San Diego | 5263919774US | $35,000 |
| Brightwood College – Riverside | 6093947589US | $339,659 |
| Brightwood Career Institute – Philadelphia | 5982911241US | $127,693 |
| Brightwood College – Fort Worth | 6543800787US | $130,269.19 |
| Brightwood College – Dayton | 3932974588US | $534,137 |
| Brightwood College – Charlotte | 3674489170US | $485,006 |
| Brightwood Career Institute – Broomall | 5791323677US | $402,077 |
| Kaplan College – Bakersfield | 9424396265US | $57,703 |
| Brightwood College – Beltsville | 5425714261US | $109,692 |
| Brightwood Career Institute – Franklin Mills | 2862614111US | $535,232 |

55. National Union initially rejected the Claims on the grounds that the Claims belonged to the Receivership Estate and needed to be asserted by the Receiver. On August 7, 2020, the Receiver adopted each of the Claims as submitted by Monroe.

56. Between September and December of 2020, National Union again rejected each of the Claims.

57. The Plaintiffs have worked to gather requested documents on the Claims and has provided National Union with additional documentary evidence.

58. However, due to theft, lost records, inaccessible records, and database access issues, many documents requested by National Union were not available. The Plaintiffs have continued their collection efforts.

59. On December 19, 2022, National Union agreed in writing to toll the statute of limitations for a suit to be brought under the Policy to February 28, 2023.

60. On February 24, 2023, the Receiver wrote National Union contesting its denial of coverage of the Virginia College – Birmingham, Culinary School Claim, providing additional documentation and details regarding the Claim, and seeking to toll the statute of limitations for all the Claims to give the parties time to resolve them.

61. On February 27, 2023, National Union again denied coverage of the Claims, and rejected the Receiver's request to toll the statute of limitations.

62. Given National Union's refusal to negotiate the Claims or extend the time, the Plaintiffs had no choice but to file this lawsuit.

## COUNT I
### (BREACH OF CONTRACT)

63. Plaintiffs reallege and incorporate by reference each of the previous allegations.

64. The Policy is a contract for insurance between Defendant and ECA, drafted by Defendant.

65. Defendant has a contractual obligation to pay for damages and losses incurred and covered by the Policy.

66. Plaintiffs made multiple requests to Defendant for coverage of the Claims under the Policy beginning on February 5, 2019 and continuing into February of 2023.

67. The Claims were covered under Insuring Agreement 1.A and 1.D of the Crime Coverage Section of the Policy.

68. ECA and the Plaintiffs performed all of ECA's obligations under the Policy.

69. Defendant breached the contract by failing to act in a commercially reasonable manner and failing to make payments due under the Policy.

70. Plaintiffs granted Defendant several opportunities to cure the defects and breaches, but Defendant failed to do so.

71. As a direct and proximate result of Defendant's breach, Plaintiffs suffered substantial damages, including, but not limited to, the loss of monies owed under the Policy for the Claims, delay in payments to creditors from the Receivership Estate, incidental costs, and legal fees.

72. As a direct and proximate result of Defendant's breach of contract, ECA, Plaintiffs, and the creditors of ECA's Receivership Estate, have been damaged in an amount to be proven at trial, but not less than $5.73 million.

## COUNT II
## (BAD FAITH DENIAL OF COVERAGE)

73. Plaintiffs reallege and incorporate by reference each of the previous allegations.

74. Plaintiffs made valid Claims for coverage under the Policy.

75. Defendant engaged in a policy to circumvent payment of validly owed amounts.

76. Defendant's denial of the Claims was frivolous and unfounded.

77. Defendant's blanket refusal to pay any amounts on the Claims was unjustified.

78. Defendant did not have reasonable grounds to exclude or deny coverage of the Claims under the Policy.

79. Defendant failed to fully and completely investigate and process the Claims.

80. Plaintiffs made proper demands pursuant to O.C.G.A. § 33-4-6, but Defendant refused to pay.

81. Defendant acted in bad faith, which caused Plaintiffs additional losses. Defendant is therefore liable for compensatory damages in the amount of the losses claimed, attorneys' fees, and statutory penalties in the amount of fifty percent (50%) of Defendant's liability for the losses.

## COUNT III
## (DECLARATORY JUDGMENT)

82. Plaintiffs reallege and incorporate by reference each of the previous allegations.

83. This case involves an actual controversy of a judicable nature between the parties concerning their respective rights and legal relations under the Policy.

84. A declaratory judgment by the Court, pursuant to O.C.G.A. §§ 9-4-1 et seq., that the Claims are covered by the Crime Coverage Section of the Policy would terminate the uncertainty or controversy giving rise to this civil action.

85. Plaintiffs are in need of intervention by the Court to settle and afford relief from uncertainty and insecurity with respect to his rights, status, and legal relations with National Union relative to the coverage of the Claims under the Policy, and the ends of justice require that the declaration be made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

A. Against Defendant and in favor of the Plaintiffs for breach of contract in an amount to be proven at trial;

B. Against Defendant and in favor of the Plaintiffs for bad faith denial on the part of the Defendant in an amount to be proven at trial;

C. Statutory damages be awarded in favor of the Plaintiffs pursuant to O.C.G.A. § 33-4-6;

D. Awarding the Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses pursuant to O.C.G.A. § 33-4-6 and O.C.G.A. § 13-6-11;

E. Award of Punitive damages against Defendant and in favor of Plaintiffs in an

amount to be proven at trial;

F. Award of pre-judgment interest against Defendant and in favor of Plaintiffs pursuant to O.C.G.A. § 51-12-14

G. Award of post-judgment interest against Defendant and in favor of Plaintiffs;

H. Declaring the Claims covered by the Policy; and

I. Granting such other and further relief as the Court deems just and proper.

DATED: February 28, 2023

          **RESPECTFULLY SUBMITTED:**

          */s/ James F. Banter*
          James F. Banter (Georgia Bar No. 581797)
          *Counsel to John F. Kennedy, Receiver*

**JAMES, BATES, BRANNAN, GROOVER LLP**
231 Riverside Drive, P.O. Box 4283
Macon, Georgia 31208-4283
T: (478) 742-4280
F: (478) 742-8270
*jkennedy@jamesbatesllp.com*
*jbanter@jamesbatesllp.com*

          */s/ Daniel B. Snipes*
          Daniel B. Snipes (Georgia Bar No. 665769)
          *Counsel to Monroe Capital Management Advisors, LLC*

**TAULBEE RUSHING SNIPES MARCH & HODGIN, LLC**
12 Siebald Street, P.O. Box 327
Statesboro, Georgia 30458
T: (912) 764-9055
F: (912) 764-8687
*dsnipes@statesborolawgroup.com*

/s/ Thomas C. Cronin
Thomas C. Cronin
*Of Counsel to Monroe Capital Management Advisors, LLC*

**OF COUNSEL TO MONROE CAPITAL MANAGEMENT ADVISORS, LLC:**
Thomas C. Cronin
**CRONIN & CO., LTD.**
120 North LaSalle Street, 20th Floor
Chicago, Illinois 60602
T: (312) 500-2100
tcc@cronincoltd.com